# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| NORMAN TIMBERLAKE, | ) |
| Plaintiff, | ) |
| MICHAEL ALLEN LAMBERT,<br>DAVID LEON WOODS, | )<br>)<br>)  No. 1:06-cv-1859-RLY-WTL |
| Intervenor Plaintiffs, | ) |
| vs. | ) |
| ED BUSS, Superintendent,<br>Indiana State Prison, | )<br>) |
| Defendant. | ) |

### Entry Discussing David Leon Woods' Motion for Preliminary Injunction

This cause came before the court on April 26, 2007, for a hearing on the motion for preliminary injunction of intervenor plaintiff, David Leon Woods. Mr. Woods was present through his counsel of record and the defendant was present through his counsel of record. In addition, intervenor plaintiff Lambert and plaintiff Timberlake were present through their counsel of record.

This Entry contains the court's findings of fact and conclusions of law. *Fed. R. Civ. P.* 52(a).

### I. Background

As used herein, "plaintiff" or "Woods" refers to David Leon Woods, and "defendant" or "Superintendent" refers to Indiana State Prison Superintendent Ed Buss.

The action was originally filed by Norman Timberlake, who is also on Indiana's death row at the Indiana State Prison. Woods and Michael Lambert ("Lambert") sought leave to intervene through motions filed on March 5, 2007. These motions were granted on April 10, 2007. Woods and Lambert then filed their respective statement of claims on April 17, 2007. This was followed, in Woods' case, with the filing of his application for a preliminary injunction on April 18, 2007.

Woods' claim is that the combination of drugs to be used by the Superintendent, in the absence of trained personnel and with inadequate monitoring of Woods' condition once the procedure is underway, creates a serious risk that the drugs will not be properly administered and that errors in these steps will likely cause Woods to suffer excruciating pain of actual suffocation when the second of the three drugs is given and/or the extreme generalized burning sensation, massive muscle cramping, and cardiac arrest from the third of those chemicals. These circumstances, according to Woods, violate his rights under the Eighth Amendment to the United States Constitution. The relief Woods seeks in joining this action is an injunction prohibiting the Superintendent from executing Woods by the proposed means of lethal injection. He does not challenge either his conviction or his sentence and does not seek to prevent the State of Indiana from executing him by lethal injection in a lawful manner. The relief Woods seeks through his application for a preliminary injunction is to preserve the status quo until the merits of his claim (and the claims of his co-plaintiffs) can be established.

Superintendent Buss has answered Woods' claim and has responded to the application for a preliminary injunction. In addition, Superintendent Buss filed a motion for summary judgment based in part on the argument that Woods failed to exhaust available administrative remedies prior to joining this lawsuit. That motion has been denied through a separate written ruling issued concurrent with this Entry.

The issues which arise from Woods' application for a preliminary injunction and the Superintendent's response to it are: 1) whether Woods' challenge has been timely brought or whether Woods has delayed unnecessarily in seeking relief; and 2) whether Woods shows a significant probability of success on the merits.

## II.  Findings of Fact

1.   Woods has been sentenced to death by an Indiana court. His challenges to his conviction and sentence have been unsuccessful. He is presently confined at the Indiana State Prison in Michigan City. When Woods sought to intervene in this action he had been on death row at the Indiana State Prison for at least 17 years.

2.   Woods' execution has been set to be carried out before dawn on Friday, May 4, 2007. The Order setting that execution date was issued by the Indiana Supreme Court on March 26, 2007.

3.   Under Indiana law, death sentences shall be carried out by "intravenous injection of a lethal substance or substances . . . in a quantity sufficient to cause the death." IND. CODE § 35-38-6-1(a). Details of the execution are left to the Indiana Department of Correction to implement. IND. CODE § 35-38-6-1(d).

4. The protocol which will be used in the impending execution is established in Operation Directive ISP 06-26 (March 6, 2007) (hereafter "Directive 06-26") and in select Indiana statutes. Superintendent Buss was principally responsible for the composition of Directive 06-26, though he consulted various sources in doing so. It is noted in one decision that "a typical lethal injection protocol consists of administering a succession of three drugs to effect the inmate's death. The first one, sodium pentothal, acts as an anesthetic, while the second, pancuronium bromide, paralyzes the body and prevents the inmate from moving or otherwise showing pain or discomfort. The final chemical, potassium chloride, is what stops the heart and actually causes death." *Hill v. McDonough,* 2006 WL 2556938 (N.D.Fla. September 1, 2006) (citing a study published in *The Lancet,* "Inadequate Anaesthesia in Lethal Injection for Execution," Vol. 365, *The Lancet* 1412-14 (April 16, 2005)). The chemicals to be used in the execution of David Woods follow this typical lethal injection protocol. *See Bieghler v. State,* 839 N.E.2d 691, 695 (Ind. 2005): "Three drugs are injected in sequence: sodium pentothal, a fast-acting anesthetic intended to render the prisoner unconscious; pancuronium bromide, which stops a person's breathing; and potassium chloride, which stops a person's heart."

5. There have been 14 executions by lethal injections at the Indiana State Prison since 1995. Superintendent Buss is an experienced prison administrator, having performed various roles in 9 of those 14 executions at the Indiana State Prison. He has supervised the most recent 3 executions in the State of Indiana as Superintendent, a position he has held since August 2005.

6. Directive 06-26 is to be implemented through a series of procedures set forth in the Directive itself. As might be expected, the successful implementation of Directive 06-26 depends on several individuals with distinct responsibilities. Those individuals are sufficiently trained and experienced, and the procedures to guide them in carrying out their responsibilities are sufficiently detailed, so as to not create a significant and unnecessary risk that Woods will suffer unnecessary pain during the execution process. Directive 06-26 itself and the Superintendent's approach to this task show that the planning and preparation for Woods' execution have been undertaken with great care. By way of illustration:

   a. Woods has undergone a physician's assessment in recent weeks to determine whether there will be difficulty in locating a suitable site for the intravenous injection. That assessment yielded a prediction that a suitable vein will be found with little or no difficulty.

   b. The mixture and injection of the chemicals is carefully arranged by members of the IV team. The chemicals are mixed approximately 40 minutes before they are to be used. All members of the IV team, and some members

of the injection team, have now been trained in IV therapy and are now certified to start, maintain and sustain intravenous lines. The injection site is monitored, as is the tubing. A physician is in the immediate vicinity of the execution chamber if needed for either consultation, inspection or repair of any aspect of the intravenous line.

c.    The sequence of the chemical injections is directed by the Superintendent, who with trained members of his staff determine when injection of the next chemical is appropriate. If a line becomes infiltrated, or if there is leakage or stoppage, for example, that situation would be rectified before continuing with either completion of the chemical presently being injected or injection of the next chemical.

d.    Two complete sets of syringes are prepared. One set is used as a backup in the event the first attempt fails. The syringes are numbered and color coded.

e.    After being escorted to the execution chamber, the offender is placed onto a stationary surgical gurney with his arms exposed. His arms are fastened to the gurney at the wrist, and his legs are fastened to the gurney, each with leather restraints. Bilateral IV fluid drips are established in the veins of the inmate's arms. One line is selected as the line in which the chemicals are placed. The IV line is started with a saline solution. The catheter is held to the arm with tape. The purpose of the first chemical, sodium pentothal, is to act as an anesthetic. The effectiveness of the sodium pentothal is confirmed before the second chemical is injected. This is done through confirmation that the offender has lost consciousness, shows no reflex or muscle response and has no response to noxious stimuli (ammonia tablets).

f.    When the injection process is complete, the physician enters the room to check the offender for signs of life. The actual time of death is when the physician pronounces death.

7.    The injunctive relief sought by Woods could not be granted without preventing the State of Indiana from carrying out the execution of Woods on May 4, 2007.  That could only be accomplished in the present case through the entry of a stay of that execution. *See Resendiz v. Livingston,* 2006 WL 1787989 (S.D.Tex. June 26, 2006)(explaining the last-minute challenge to the Texas lethal-injection process as a request for a stay of execution). Indeed, the relief Woods seeks in his application for a preliminary injunction is "a preliminary injunction presenting [sic: preventing] the Defendant from executing him by means of lethal injection protocol under the protocol currently in effect in the State of Indiana."

8. Any findings of fact which should be treated as conclusions of law are to be treated as such, and any conclusions of law that should be treated as findings of fact should also be treated as such.

### III. Conclusions of Law

Based on the foregoing findings of fact, the court makes the following conclusions of law:

1. Woods' claim is brought pursuant to 42 U.S.C. § 1983. This court has subject matter jurisdiction over the claim pursuant to 28 U.S.C. § 1331, which provides that "[t]he District Courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." He seeks only injunctive relief in this action. His claim is asserted against the Superintendent in his official capacity only. *Greenawalt v. Indiana Dept. of Corrections,* 397 F.3d 587, 589 (7th Cir. 2005) (*citing Luder v. Endicott,* 253 F.3d 1020, 1024-25 (7th Cir. 2001)).

2. To state a claim under § 1983, a plaintiff must allege: 1) that he was deprived of a right secured by the Constitution or laws of the United States; and 2) that the deprivation was caused by a person acting under color of state law. *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 155-56 (1978).

3. In *Nelson v. Campbell,* 541 U.S. 637, 644 (2004), the Supreme Court held that a condemned prisoner may raise an Eighth Amendment "cruel and unusual punishment" challenge to a specific ancillary medical procedure that is not a mandatory part of the execution protocol pursuant to 42 U.S.C. § 1983. In *Hill v. McDonough,* 126 S. Ct. 2096, 2102 (2006), the Court held that the condemned can challenge the drug cocktail under § 1983 so long as he accepts the inevitability of execution. The Superintendent does not challenge the use of § 1983 as the proper statutory vehicle to present Woods' challenge, nor after *Hill* and *Nelson* does it appear open to question. "A suit seeking to enjoin a particular means of effectuating a sentence of death does not directly call into question the 'fact' or 'validity' of the sentence itself--by simply altering its method of execution, the State can go forward with the sentence." *Nelson,* 541 U.S. at 644.

4. Section 1983 is not itself a source of substantive rights; instead it is a means for vindicating federal rights elsewhere conferred." *Ledford v. Sullivan,* 105 F.3d 354, 356 (7th Cir. 1997) (citing *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). Accordingly, "the first step in any [§ 1983] claim is to identify the specific constitutional right infringed." *Albright v. Oliver,* 510 U.S. 266, 271 (1994).

5. In the present case, it is the Eighth Amendment's proscription against

5

the imposition of cruel and unusual punishment which provides the applicable constitutional protection. *Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."). To state a conditions of confinement claim, a plaintiff must satisfy two prongs:

> [f]irst, the deprivation alleged must be, objectively, "sufficiently serious," . . . ;  a prison official's act or omission must result in the denial of "the minimal civilized measure of life's necessities" . . . second requirement follows from the principle that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." . . . To violate the Cruel and Unusual Punishments Clause, a prison official must have a "sufficiently culpable state of mind.". . .  In prison-conditions cases that state of mind is one of "deliberate indifference" to inmate health or safety.

*Farmer v. Brennan,* 511 U.S. 825, 834 (1994) (citations omitted). In the particular context presented by Woods' claim, the pivotal question concerning the merits of this claim is not what is optimally desirable, as, for example, in a surgical setting, but rather what is minimally required to avoid a violation of the Eighth Amendment. *See generally Gregg v. Georgia,* 428 U.S. 153, 173 (1976) (holding that punishments are cruel when they "involve the unnecessary and wanton infliction of pain").

      6.    *Hill* and *Nelson* emphasize two critical factors in evaluating whether a stay of execution should issue: (1) whether the inmate has delayed unnecessarily in bringing the claim; and (2) whether the inmate shows a significant probability of success on the merits. *See Hill,* 126 S. Ct. 2096; *Nelson,* 541 U.S. 649-50. Each question is explored in the setting of Woods' application for a preliminary injunction.

      7.    Because Woods seeks injunctive relief, he has the burden of proving by a clear showing that a balancing of the equities falls in his favor. *See Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997).

> In assessing whether a preliminary injunction is warranted, a court must consider whether the party seeking the injunction has demonstrated that: 1) it has a reasonable likelihood of success on the merits of the underlying claim; 2) no adequate remedy at law exists; 3) it will suffer irreparable harm if the preliminary injunction is denied; 4) the irreparable harm the party will suffer without injunctive relief is greater than the harm the opposing party will suffer if the preliminary injunction is granted; and 5) the preliminary injunction will not harm the public interest.

6

*Kiel v. City of Kenosha,* 236 F.3d 814, 815-16 (7th Cir. 2000) (citing *Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc.,* 149 F.3d 722, 726 (7th Cir. 1998)).

      8.    "[L]ike other stay applicants, inmates seeking time to challenge the manner in which the State plans to execute them must satisfy all of the requirements for a stay, including a showing of a significant possibility of success on the merits." *Hill v. McDonough,* 126 S. Ct. 2096, 2104 (2006). There is in this context, moreover, a temporal concern of unique significance. In *Nelson,* the Supreme Court set out the factors relevant to granting a stay in the context of an impending execution:

> A stay is an equitable remedy, and equity must take into consideration the State's strong interest in proceeding with its judgment and . . . attempts at manipulation. Thus, before granting a stay, a district court must consider not only the likelihood of success on the merits and the relative harms to the parties, but also the extent to which the inmate has delayed unnecessarily in bringing the claim. Given the State's significant interest in enforcing its criminal judgments, there is a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay.

*Nelson,* 541 U.S. at 649-50 (citations and quotations omitted). The Supreme Court has stressed the need to be wary of obvious dilatory tactics and to guard against "abusive delay, which has been compounded by last-minute attempts to manipulate the judicial process." *Gomez v. United States Dist. Ct.,* 503 U.S. 653, 654 (1992)("A court may consider the last-minute nature of an application to stay execution in deciding whether to grant equitable relief."). With its issuance of *Hill,* the Supreme Court reiterated a state's "important interest in the timely enforcement of a sentence" and emphasized that "the federal courts can and should protect states from dilatory . . . suits." *See Hill*, 126 S. Ct. at 2104. The Court also highlighted the equitable powers of the federal courts "to dismiss suits [that are] speculative or filed too late in the day." *Id.*; *see also Smith v. Johnson,* 440 F.3d 262, 263 (5th Cir. 2006).

      9.    This is a case where, indisputably, the equities tilt against Woods as to the timing of his joinder in this case.

      a.    As noted, Woods was on Indiana's death row for more than 17 years before joining in this lawsuit. The lawsuit itself was filed in December 2006, three months before Woods filed his motion to intervene. No judicial or legislative event in Indiana caused Woods' challenge to the lethal injection protocol to become ripe in the past five months.

      b.    "[A] challenge to a method of execution may be filed at any time after the plaintiff's conviction has become final on direct review." *Neville v. Johnson,* 440 F.3d 221, 222-23 (5th Cir.) (citing *White v. Johnson,* 429 F.3d

7

572, 574 (5th Cir.), *cert. denied,* 126 S. Ct. 601 (2005)), *cert. denied,* 126 S. Ct. 1192 (2006). Woods' conviction became final on direct review on June 28, 1991.

   c.    The court took 35 days to act on Woods' motion for leave to intervene. Woods took nearly twice as long, 66 days, after Mr. Timberlake filed this lawsuit before filing his motion for leave to intervene. Woods argues that his action is not dilatory because his request to intervene was filed before an execution date was set and that once he was allowed to intervene, Woods, "complete[d] the necessary discovery for the preliminary injunction, proceeded to an expedited hearing, and has complete[d] the evidentiary record." This argument was clearly rejected in *Harris v. Johnson,* 376 F.3d 414, 417 (5th Cir. 2004). In responding to the same contention raised here, the court stated:

> That argument is nothing more than a restatement of the very thing the plaintiff is not entitled to do under *Gomez,* 503 U.S. at 654, 112 S. Ct. 1652--namely, to wait until his execution is imminent before suing to enjoin the state's method of carrying it out. The denial of certiorari may well have cast the issue in a new and urgent light for Harris, but it also entitled the state to set a date for, and proceed with, his execution.

*Id.* (vacating a temporary restraining order and dismissing the § 1983 complaint). Although it was the denial of certiorari which Harris argued was the path-clearing event in *Harris,* whereas it was the expectation of an execution date being set which Woods assigns to that role in this case, the point is the same: a challenge to the state's method of execution could have been brought years ago and only now, on the eve of his execution, has Woods sought injunctive relief.

   d.    The Supreme Court recognized in *Hill* that "[b]oth the State and the victims of crime have an important interest in the timely enforcement of a sentence," 126 S. Ct. at 2104, and nothing in *Hill* diminishes or disparages this interest. The Court reiterated in *Hill* what it said in *Nelson,* 541 U.S. at 649-50, that a stay of execution is an equitable remedy, not available as a matter of right, and that how federal courts considering granting a stay must be "sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Hill,* 126 S. Ct. at 2104. "That interest is heightened when lengthy state and federal proceedings reviewing the conviction have run their course." *Baker v. Saar,* 402 F.Supp.2d 606, 608 (D.Md. 2005).

   e.    When considering the foregoing circumstances, and when considering "the extent to which [Woods] has delayed unnecessarily in bringing the claim," *Nelson,* 541 U.S. at 649-650, and giving appropriate regard to the "strong

equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay," *id.*, at 650, knowing that the merits of Woods' claim in intervention could not be reached without the entry of a stay, Woods' application for a preliminary injunction must be denied on the basis of his delay in bringing (or joining) a challenge to the execution protocol.

10. Even if the court could determine that Woods had asserted his claim in this action in a timely manner (relative to consideration of his application for a preliminary injunction), Woods would not be entitled to preliminary injunctive relief on the grounds that there is not a reasonable likelihood of success on the merits of the underlying claim. This conclusion rests on two conclusions. First, as explained, Directive 06-26, both as written and as it will be applied, does not create a significant and unnecessary risk that Woods will suffer unnecessary pain during the execution process. Second, the defendant has negated the existence of the equally necessary subjective element of an Eighth Amendment violation–the requirement of deliberate indifference.

11. To expand further on the first element of a viable Eighth Amendment claim, several factors are pertinent:

a. First, several of Woods' allegations concerning deficiencies in the execution protocol are simply entirely off base, wholly contradicted by the guidelines in Directive 06-26. For example, the allegations in paragraphs 11, 12 and 26 of Woods' statement of claim cannot actually be said to be at issue here because they are contradicted by the language of Directive 06-26.

b. Second, the court has noted that the objective prong of an Eighth Amendment violation requires a showing of the unnecessary and wanton infliction of pain. The critical question in this case is not what is optimally desirable, as, for example, in a surgical setting, but rather what is minimally required to avoid a violation of the Eighth Amendment. *Forbes v. Edgar,* 112 F.3d 262, 267 (7th Cir. 1997) ("[a plaintiff] is not entitled to demand specific care. [He] is not entitled to the best possible care. [He] is entitled to reasonable measures to meet a substantial risk of serious harm to [him].").

c. Third, as an inescapable matter of fact, an execution causes some pain and suffering for an inmate. *Louisiana ex rel. Francis v. Resweber,* 329 U.S. 459, 464 (1947). "Punishments are cruel when they involve torture or a lingering death." *In re Kemmler,* 136 U.S. 436, 447 (1890). The court has found that Directive 06-26 does not create a significant and unnecessary risk that Woods will suffer unnecessary pain during the execution process. Woods offers two ripostes to this view. The first is that the standard of care advocated by his expert, Dr. Heath, should either be adopted as the Eighth Amendment standard or adopted in place of the Eighth Amendment standard. Neither

position is tenable. The second is that some problem could occur during the Woods execution because certain mishaps have occurred elsewhere during executions by lethal injection and because scenarios can be postulated for which Executive Directive 06-26 gives no specific guidance. Woods cannot, however, build a persuasive case for injunctive relief on events which occurred elsewhere in the absence of a showing that Executive Directive 06-26 shares the flawed procedures in those situations. What he is left with, therefore, is speculation that something will go amiss during his execution. He cannot rely on this possibility as the grounds for creating a substantial risk of harm.

d.  The objective prong of the Eighth Amendment's proscription against the imposition of cruel and unusual punishments is violated in this context only if the execution will involve the unnecessary and wanton infliction of pain, and this can be shown through the existence of protocols or procedures that create an "unnecessary risk" that such pain will be inflicted. *Cooper v. Rimmer,* 379 F.3d 1029, 1033 (9th Cir. 2004). Woods has not made this showing.

12.  An Eighth Amendment violation cannot be established without a showing of the subjective prong that the Superintendent will exhibit deliberate indifference in carrying out Executive Directive 06-26. "State officials are deliberately indifferent if they 'know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official[s] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference.'" *Dunigan v. Winnebago County,* 165 F.3d 587, 590-91 (7th Cir. 1999) (quoting *Farmer*, 511 U.S. at 837).  Not only has Woods failed to offer evidence of deliberate indifference here, but Superintendent Buss has affirmatively negated the existence of this element of an Eighth Amendment violation. "There is no liability under the Cruel and Unusual Punishments Clause if a prison official has responded reasonably to a risk of harm." *Doe v. Welborn*, 110 F.3d 520, 523 (7th Cir. 1997) (citing *Farmer*). "Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." *Farmer,* 511 U.S. at 845.

13.  Additionally, Woods has not shown the existence of irreparable harm through the mere possibility that some unforeseen complication will result in a lingering death causing Woods to suffer unnecessary pain.  He cannot rely on this possibility as the grounds for substantial risk of harm. *Louisiana ex rel. Francis,* 329 U.S. at 464; *Beardslee v. Woodford,* 395 F.3d 1064, 1075 (9th Cir. 2005); *Reid v. Johnson,* 333 F.Supp.2d 543, 551 (E.D.Va. 2004).

14.  The last factor the court considers is whether the granting of the stay sought by Woods would serve the public interest. The court cannot find this to be the

case because, at least, Woods has shown no likelihood of prevailing on the merits of his claims, and there is significant public interest in the carrying out of lawfully imposed criminal judgments.

15. In summary, a review of the preliminary injunction analysis in this case could readily track the decision of Chief Judge Spencer in *Lenz v. Johnson,* 443 F.Supp.2d 785 (E.D.Va. 2006):

- "First, Lenz cannot establish the likelihood that he would sustain irreparable injury if the preliminary injunction request were denied. As courts have noted, the potential injury must be actual and imminent, and not theoretical or speculative."

- "Second, the harm to Defendants if the preliminary injunction were granted is easy to grasp. The Supreme Court in *Hill* acknowledged the interest states have in enforcing their criminal judgments, and the Court was emphatic in stating that "[t]he federal courts can and should protect [s]tates from dilatory or speculative suits." [*Hill,*] 126 S. Ct. [at 2104]. Allowing illegitimate obstructions to the orderly administration of justice would certainly harm Defendants as they try to fulfill their public duties. Moreover, states have a recognized interest in ensuring the timely execution of death sentences. See *Calderon v. Thompson,* 523 U.S. 538, 556-57, 118 S. Ct. 1489, 140 L.Ed.2d 728 (1998)."

- "Third, . . . Lenz is not likely to prevail on the merits of his Complaint."

- "Fourth, with respect to the public interest, society's interest in retribution for criminal activity would erode rapidly if patently dilatory suits were permitted to derail the administration of justice time and time again. Lenz has been facing a sentence of death for almost six years. He has exhausted all state and federal avenues for challenging his sentence and the underlying conviction, yet, curiously, Lenz has raised these lethal injection arguments for the very first time in the instant § 1983 Complaint, filed shortly before his scheduled execution date. This area of law is not new, and Virginia's lethal injection protocol has not been an ever-changing mystery--certainly not in recent years. The motivation behind Lenz's last-minute Complaint is obviously to unjustifiably delay the inevitable. The Court finds that the equities weigh heavily in favor of denying Lenz's request for injunctive relief."

The court in *Lenz* then cited *Walton v. Johnson,* No. 2:06cv258 (E.D.Va.), wherein it had granted a stay of execution, only to find that the Fourth Circuit vacated the stay of execution on the same day on which the stay was imposed. This court can also refer to a case which traveled a similar path and which carries even more weight. In *Bieghler v. Donahue*, No. 06-1300 (S.D.Ind. January 26, 2006), Chief

11

Judge McKinney considered the § 1983 challenge to the method of execution brought by an inmate on Indiana's death row. After finding that this was the proper remedial vehicle, after reciting the standard of its review pursuant to 28 U.S.C. § 1915A(b), and after reviewing the standard established in *Nelson,* Judge McKinney denied Bieghler's request for injunctive relief and dismissed the action, explaining: "Bieghler has delayed unnecessarily in seeking relief. The equities now lie with the ability of the State of Indiana to execute the sentence Bieghler received and which has withstood decades of review." *Id.*, slip op. at p. 3.  An immediate appeal was taken. A panel of the Seventh Circuit, with one judge dissenting, stayed Bieghler's execution. 163 Fed.Appx. 419 (7th Cir. January 26, 2006). The case moved forward, and the Supreme Court vacated the Seventh Circuit's Order. 126 S. Ct. 1190 (U.S. January 27, 2006). Bieghler's execution then went forward. Although the literal timing of Bieghler's case and that of Woods are different relative to their anticipated executions, analytically the timing is the same; no relief could be granted without preventing the State from carrying out the executions as scheduled. *See also White v. Johnson,* 429 F.3d 572, 574 (5th Cir. 2005)(affirming district court's dismissal of a prisoner's section 1983 challenge to his execution because he delayed filing the challenge until his execution was imminent despite being on death row for more than six years).

## IV.  Conclusion

"A court considering a stay [of execution] must . . . apply 'a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay.'" *Hill v. McDonough,* 126 S. Ct. 2096, 2104 (2006)(quoting *Nelson v. Campbell,* 541 U.S. 637, 650 (2004)). Woods has failed to overcome that strong equitable presumption here. In addition, because the evidence shows that implementing Directive 06-26 is not likely to "involve the unnecessary and wanton infliction of pain" or to "involve torture or a lingering death," Woods has failed to demonstrate by a preponderance of the evidence that any violation of his federally secured rights is likely to occur in the course of his execution as presently scheduled. This means that he has not shown a reasonable likelihood of success on the merits of the underlying claim. He has also failed to establish any of the other factors required for the issuance of a preliminary injunction. Based on the facts and law set forth in this Entry, therefore, Woods' application for a preliminary injunction, which is the functional equivalent in the present circumstances of a stay of execution, must be and is now **DENIED.**

**IT IS SO ORDERED.**

_____
RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Date:  May 1, 2007

Distribution:

Alan M. Freedman
MIDWEST CENTER FOR JUSTICE LTD
fbpc@aol.com

Carol Rose Heise
MIDWEST CENTER FOR JUSTICE LTD
fbpc@aol.com

Betsy M. Isenberg
INDIANA STATE ATTORNEY GENERAL
Betsy.Isenberg@atg.in.gov

Laurence E. Komp
lekomp@swbell.net

Thomas D. Quigley
INDIANA STATE ATTORNEY GENERAL
thomas.quigley@atg.in.gov

William Van Der Pol Jr.
bvander3@insightbb.com

Linda M. Wagoner
lmwagoner@mchsi.com

Richard A. Waples
WAPLES & HANGER
richwaples@aol.com

Brent Westerfeld
bwesterfeld@wkelaw.com

Lorinda Meier Youngcourt
EVANS & YOUNGCOURT
lmyoungcourt@hughes.net